The final case to be argued, United States v. Matheson. May it please the Court, good morning, Your Honors. My name is James Healy, and I represent Appellant Defendant Anthony Matheson. While, of course, we're happy to address any issue the Court has raised in our briefs, I'd like to focus attention on two particular issues. The first being a violation of Brady in the trial on count three, where the government failed to disclose DNA evidence during the trial, and the second being the application of the sentencing guidelines, which found that Mr. Matheson had committed a violent felony as defined in section 4B1.2. With respect to the Brady claim, at the trial, Mr. Matheson was charged with possession of two weapons, which were found in a backpack and next to the backpack outside an apartment. The government brought in six police officer witnesses that tried to establish ostensibly a constructive possession theory for the two guns. There was an arm that was outside the window. The arm was described as wearing a white sweatshirt. They also presented DNA evidence with respect to— There was also testimony that Mr. Matheson was showing—they saw Mr. Matheson showing a gun to Watson. Respectfully, Your Honor, there was testimony from one of the six officers in the hallway that he saw a man in a white hooded sweatshirt holding a gun. The other five officers did not see that. He couldn't describe the gun that was seen. At trial, there was DNA evidence presented, and the DNA evidence implicated Mr. Matheson's DNA on one of the guns. It was found that his DNA was mixed with other DNA that could not be identified. The second gun had DNA from one donor and then other DNA that could not be identified. At trial, the decision was made by defense counsel not to provide their own DNA expert, and the cross-examination with respect to the government's DNA expert was very limited. It was about two pages. It's our contention that had that DNA evidence been disclosed, it would have fundamentally changed the confidence— Why wouldn't you have brought in a DNA expert anyway, given the fact that your whole argument was that this was secondary DNA? That argument would certainly have been strengthened by a DNA expert. It may be that finding Watson's DNA on the nine added something, but I found the notion that you wouldn't bother with a DNA expert without it a bit personally. Well, Your Honor, as we were not trial counsel, I can only answer you as my opinion as a defense attorney, why I would make a decision in that respect. If you have your client's DNA and you have no other identifiable source of any other DNA, what you hope for is to get the government's witness to say, is it possible that that could be someone else's or that it got there through the transfer, the secondary low-card principle transfer? Bringing in your own expert, you're not going to get anything different. In fact, what you will get is you'll get cross-examination that goes into numbers, and juries, of course, love to hear one in three billion or one in 100 million. So you can achieve, given the limited window that you have with what's been disclosed, you can achieve what you need through cross-examination. The problem became, I think you alluded to, is that if you refer to the record, I believe it's page 727 or 728, where the cross-examination of the witness takes place, counsel says, well, there's a mixture of Mr. Matheson's DNA and other unidentified DNA on this weapon, and he concedes yes. And she says, is it possible that it could have got there through secondary transfer? And the witness says, it's possible. Well, the next logical question would be, can you exclude Troy Matheson from the donors of that unknown DNA? No. And then the next question is, if Mr. Matheson shook hands with Troy Watson that night before the police arrived, if they high-fived, if they were passing back and forth something, could Mr. Watson's DNA... Couldn't you have done that, given that he was initially, Watson was initially arrested, was not charged, there was some evidence, wasn't the DNA evidence, that the other gun was his? I mean, there was some evidence of that, from the way it was tossed and so on, so that the whole notion that this secondary DNA would have been Watson's, I think, kind of is there. Now, I'm not saying that having his DNA on the other gun doesn't add something, but my question really is, how material is it? Well, Your Honor, I will say this. Yes, the argument could, in summation, the counsel could have argued to the jury, ladies and gentlemen, this could have been Troy Watson's DNA, but with the evidence before the jury, he could have easily said, it's Judge Chin's DNA, or Judge Kers's DNA, because there was no indication that Troy Watson's DNA was anywhere. What is the prejudice, because Mr. Matheson was acquitted on the Taurus-9, which did not have his DNA on it? What difference would it have made? That's precisely the prejudice, Your Honor, because despite all of those witnesses, all those police officer witnesses that tried to tie him to the other gun, despite, as you point out, the witness that said, oh, I saw a man in a white sweatshirt holding the gun, the jury convicted only on the DNA. They didn't do it on constructive ownership. Correct. That is clearly so, so they must have done it on actual ownership, but even so, the link to having Watson's DNA on it to this is not that direct, is it? I think it is, Your Honor. I think the only thing tying Mr. Watson, Mr. Matheson, to that gun was his DNA, and had the jury been, and this goes to, I think, one of our arguments regarding 403 balancing, had the jury been able to hear that actually, not to contradict, Your Honor, but Mr. Watson was initially charged with possession on that weapon, and the charges were dismissed, and if the information had been put before the jury, ladies and gentlemen, Mr. Watson's DNA was found on this gun, and the charges were dismissed. It would have undermined the media bias that juries place on DNA evidence. In fact, I think it would have undercut their belief that perhaps the DNA was as compelling as it was. If I could turn to my argument regarding the, yeah, Your Honor, I think there's been a lot of litigation in and around what is the meaning of the violent criminal ACA definition as applied to the guidelines. I think that to try to summarize it as briefly as possible, it all comes down to this. Can the commentary on the guidelines be held as dispositive when it is inconsistent with the guideline above, above the line, as it were? The challenge is this. If you look closely at the commentary, every word of the guideline, section A and B, is in that commentary. It says the exact same thing, except it adds other enumerated crimes. I believe that this clearly violates statutory interpretation. You can't have a commentary that makes this— Do you agree that dicta in Jones 2 runs against your argument? It is only dicta because Jones was dealing with robbery in the first degree, but I reread that opinion. I was on the panel, and it seemed to me that at least in dicta, the court acted as if it was covered. Your Honor, I see my time is up. May I answer your question? I agree that there is dicta in Jones 2, but I would suggest that what that dicta means is this court has not considered the issue, and I would point you to footnote number 6 on Stuckey v. The United States decided subsequent to Jones, that's 878F3D62. And in footnote 6, this court says, We do not need to address in this opinion the question of whether all—and that's high emphasis in the original—New York robberies qualify as violent felonies under the ACCA, i.e. whether just forcible stealing requires the degree of force mandated by the 2010 Johnson decision. Now, the point is this. If you're going to assume that the commentary is of equal weight to the statute, then this is a meaningless statement, because robberies— Forcibly steals. What does that mean? Does that not imply the use of force? According to the Supreme Court in, I call it Johnson 1, Johnson 2010, they were very clear that forcible means, in this context, must be violent physical force. It is not enough to have incidental physical force, and in fact, as we cite in our brief, there are several— My question is with respect to the language in the robbery in the second degree statute when it says, it says you forcibly steals property. What does that mean? In fact, I think the statute says through force or threatened use of force, Your Honor. But I think that what New York State has indicated is that any force, New York State has indicated that any force constitutes requisite force, but Johnson has said that's not enough. It's got to be violent physical force, and that's for the first clause. But our argument is that first clause becomes meaningless, it becomes superfluous if you are going to look at the commentary as being dispositive, and I see my time is up, and I'll reserve. All right. Thank you. We'll hear from the government. May it please the Court, my name is Sarita Kamadi Reddy. I'm an assistant U.S. attorney in the Eastern District of New York, representing the appellee in this matter. I will respond to counsel's arguments in turn. First, with respect to the allegation of a Brady violation, I think there are two points worth emphasizing in response to defense counsel's arguments. First, as the Court has noted, there was evidence of actual possession of the gun. Officer Napolitano testified that Mr. Matheson, he personally viewed Mr. Matheson holding a gun in the hallway of the building. That testimony was specific to Mr. Matheson, it's at appendix page 550, and the DNA evidence that was presented, showing that Mr. Matheson's DNA profile was associated with one of the two pieces of DNA on that gun, corroborated Officer Napolitano's testimony. Therefore, counsel's incorrect that the DNA is the only thing tying. Yes, yes. So there is that evidence, but you know, juries believe police statements up to a point, especially when it's one policeman who says it and five others don't. So the question is, the DNA certainly strengthens that enormously. And the question is whether the government's admitted Brady violation, whether it's material or not, would have made, cast doubt, or allowed the defendant to argue in a way that would have cast doubt on the validity of the DNA evidence. We don't need to show that they would have acquitted, but enough to cast doubt. And that's what you've got to argue. I mean, that there's sufficient evidence, of course. No one's questioning that. Certainly, Your Honor. And I think the answer to that question is, DNA evidence identifying DNA on a gun of acquittal is simply too attenuated to cast doubt on the gun of conviction. And the reason for that is because every question that defense counsel wanted to raise during cross-examination, every argument that she wanted to raise during closing, she was equipped to raise and did raise. There was evidence presented that Troy Watson, another male, was standing next to the defendant and talking to him about the gun. There was evidence presented that there were numerous other males, at least three, in the apartment. There was evidence presented that the DNA on the gun of acquittal was associated with male A and male B, two identified DNA profiles. And defense counsel went out of her way to cross-examine the officers and establish that the officers touched both guns and that the officers refused to be swabbed for purposes of DNA matching. And therefore, the defense counsel did argue and had full reign to argue that there was clear evidence that other people possessed the second gun and that that could have been Troy Watson, one of the other males in the apartment, or any of the officers. So you say it doesn't matter that there was then evidence that it really was Watson. Right, because she could argue that and actually argue even better than that not knowing that it was actually Watson's. And with respect to the relevance to the count of conviction, which is the transfer argument, for the same reasons she had every ability to argue transfer from any one of those sources that were already established at trial. Moving on to the argument with respect to Jones. First, counsel argues that the commentary is inconsistent. You have not really answered their argument in the brief. We just got a letter from yesterday which very briefly touches on it, but doesn't really go into the nature of the argument that opposing counsel has made, right? Yes, Your Honor, that's correct. And we're happy to submit supplemental briefing if Your Honor. I'm also happy to address it now in oral argument, understanding that counsel has the opportunity to rebut me. But essentially, as a preliminary matter, the commentary is written contemporaneously with the guideline by the same body. So I think it is a stretch of reason to say that when the same body is writing and revising these guidelines that they're simultaneously creating commentary that is self-contradictory. Second, that commentary does enumerate several other crimes that fall into what the guidelines other specify, otherwise put in a category under the guideline itself, under the residual clause of crimes that present a serious potential risk of physical injury to another. Now, this court has already done the relevant analysis in Jones, and I understand that it's dicta to the extent that we look narrowly at Jones's holding as applying only to first-degree robbery. However, Jones's reasoning is quite extensive. We look at robbery, too. There are cases where there's a second person involved, and the second person is blocking the victim. And those cases are robbery in the second degree, but they don't seem to involve violence in the sense that's contemplated. Or do they? I think they do, Your Honor, because regardless of the particular positioning, as long as there's a force or threat of force, the way that New York law... Is it any force, or is it... What kind of force are we talking about? I mean, it's force to some extent if someone stands in the way and the victim can't get out the door. Right. And there's another. What about the case where the second person is driving a getaway car, and that seems to fall under robbery in the second degree? And does that case involve violent force? I think, Your Honor, with the getaway car, that would fall under a conspiracy theory, so I'm not sure that that would be the substantive crime, but... Well, there's people versus Washington. I mean, I'm looking at what convictions for robbery in the second degree under New York law. Sure. Right? Because we're looking at what's theoretically possible. Yes. So, first of all, on what constitutes force, I think you have to look at the New York statute and its definition. Johnson 2010 is interpreting force for purposes of the ACCA, and that does not necessarily translate to the guidelines. Beckles establishes that the same interpretive methods need not be applied between the statute and the guidelines because the guidelines are not subject to vagueness concerns. So the real reference point should be the New York statute. And as this Court said in Jones 2, even baseline, if you look at the reasoning in Jones 2, the Court reasons... The distinction that the Court made wasn't on the meaning of language. It was on whether vagueness undercuts a guideline in the same way that it undercuts the ACCA. That's a completely different question. They said it doesn't undercut the guidelines because the guidelines are discretionary, but that doesn't tell us anything about how they interpret language. Well, sure, but in terms of how we interpret language, we would want to look at the text of the guideline, the structure of the guideline, which includes the commentary. I'll go back to that, but don't tell me that the Supreme Court says that we have to read the language differently because it's ACCA and the other. That isn't what they were talking about in Beckles at all. No, understood, Your Honor, and I stand corrected on that. That wasn't my intention. Only that the Supreme Court said that you don't have to read them the same. It doesn't say it one way or the other. And I would submit that the proper way to read the guideline is in the ACCA. The argument opposing counsel is making is that if the guideline actually covers any kind of robbery because of the commentary, then what is the point of a specific clause before? That, I think, if I understand, is the nature of the argument they are making. That argument was not met directly in Jones 2, and frankly, I'd like to hear an answer to it. I think there may well be a good answer, but so far I haven't heard it. Sure. I think the answer to that question is 4B1.2 has a phrase in it that is rather general. It lists a series of offenses and then says, or offenses that otherwise involve conduct that presents a serious potential risk of physical injury to another. And the commentary serves to add color to that general phrase, as commentaries often do, and particularly in the context of guidelines commentaries. If we look at the language of the robbery statute, a person is guilty of robbery in the second degree when he forcibly steals property and when he is aided by another person actually present. I think the defendant argues that that is the least of the severable acts. Does that language necessarily involve the serious potential risk of physical injury to another? I think it does, and I think this Court has already explained why it does, because in the reasoning to Jones 2, the Court explained that even the baseline New York robbery statute, NYPL 160, when it requires forcibly stealing, meets the generic definition of robbery, and because robbery is enumerated in the commentary, it is that that is what is seen. What's the reasoning there? You're saying the forcibly stealing necessarily implies serious potential risk of physical injury to another. And that the fact that because the guidelines commentary then enumerates robbery, that relevant comparison, as this Court has explained, is whether the generic definition It's all conclusions. I'm trying to understand why. I mean, why is, why, because I do see these other examples that arguably do not involve the risk of, serious risk of physical injury to another. I think, and I'm referring back to Jones 2 in explaining this, because I think the reasoning is on point, and it's that the generic definition of robbery, although conventionally involves the use or threat of force, which would pertain to the force clause that's not being discussed at this moment, it also, as the Court has explained, a majority of states have departed from that common law definition, broadening it to also prohibit the peaceful assertion of dominion, followed by the use or threat of force. And the Court then finds that because of the narrow way in that New York actually defines the restrictions on the temporal relationship between the underlying theft and the use of force, or threat of force Let's do this. I think we're going to need some supplemental briefing from the government. So why don't you finish up, and then we'll hear the rebuttal. Absolutely, Your Honor. We're happy to submit. Finally, I just want to mention a response to counsel's argument that the charges, counsel argued that the fact that Mr. Watson's charges were dismissed despite DNA should have been raised and could have been raised at trial. I want to make one thing just clear for the factual record. There's no evidence in the record what the reason for the State's dismissal of Mr. Watson's charges were, and there's no evidence whether the State prosecutors knew about the DNA match before or after that dismissal. There's simply nothing in the record about that. Thank you. Thank you. I'm going to try to dispense with the Brady part of the rebuttal very quickly because we can get lost down that rabbit hole. Opposing counsel argued that counsel could make a better argument for transfer not knowing who the DNA belonged to, and as a legal exercise that may very well be true, but a more effective argument, an argument that would have undermined confidence in a guilty verdict would have been the guy standing next to him that night who he had implicitly had contact with, his DNA was on one of the other guns and it can't be excluded from the gun that had his DNA on it. Going to the Jones case, I think that the critical part of the analysis here is that if you hold the commentary to be dispositive, then you can take a pen and strike through section A and strike through section B. They're superfluous. Every single word in those is in the commentary. The only thing that was done was they added another group of enumerated crimes, and counsel points out these were made at the same time. Well, they could have put them above the line. There was no reason . . . But isn't that often the case in commentary, that they are commentaries and duplicative of what is there above? I think in general, Your Honor, commentaries can be duplicative. I think often they're more illustrative. In this case, I think that Judge Chen has really focused on the question, which is above the line. We have the force clause. What is physical force? I think the Supreme Court has answered that question. The second clause, which is the residual clause, which, as you point out, Beckel said, is still in force because it's advisory, the language, serious risk of physical harm. The question is, what in robbery two implies by a categorical approach serious risk of physical harm? If there are no other questions, we'll rest on our briefs. Thank you. We'll reserve decision. The final cases are on submission. I'll ask the clerk to adjourn.  I'm sorry, yes. The government shall submit a supplemental brief on the Jones issue, ten pages, double spaced, within a week, and then the defendant can respond within a week thereafter. All right? Thank you. All right, we're adjourned.